## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JANIAH MONROE, | ) | |
| (a.k.a. Andre Patterson, R67440) | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| JOHN BALDWIN, in his official capacity | ) | |
| as director of the Illinois Department of | ) | |
| Corrections, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Janiah Monroe, by her undersigned attorneys, for her complaint against defendant John Baldwin alleges as follows:

### INTRODUCTION

1.      Plaintiff is a transgender woman currently housed at Pontiac Correctional Center, a maximum security men's prison. During her time in the Illinois Department of Corrections (IDOC), plaintiff has been repeatedly sexually assaulted, has been subjected to constant sexual harassment, and has experienced several mental health crises – including several suicide attempts and self-mutilation episodes – as a result of inadequately treated gender dysphoria and post-traumatic stress disorder. She is not safe in men's prisons.

2.      Out of fear for her own physical safety, plaintiff requested a transfer to a women's prison. IDOC officials refused her request, citing a blanket policy under which housing assignments are made solely on the basis of gender assigned to prisoners at birth. The application of this policy to plaintiff violates plaintiff's right to equal protections and her right to be free

from cruel and unusual punishment. Plaintiff seeks injunctive relief in this case to prevent further violation of her constitutional rights.

## JURISDICTION & VENUE

3.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

4.      Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

5.      Plaintiff is a 29-year-old transgender woman currently in custody of the Illinois Department of Corrections (IDOC) at Pontiac Correctional Center, a men's prison.

6.      Defendant John Baldwin is the Acting Director of the Illinois Department of Corrections. At all relevant times to the events at issue in this case, Baldwin maintained administrative and supervisory authority over the operations of all prisons in Illinois, including facility assignments.

### Transgender Identity & Gender Dysphoria

7.      Plaintiff is a transgender woman. She knew she was a girl from a very young age, but her family was not supportive of her gender identity. Around the age of twelve, plaintiff began dressing in female clothing, taking hormones, and openly identifying as female. Plaintiff entered IDOC custody at the age of nineteen.

8.      Transgender persons have a gender identity that does not align with the gender they were assigned at birth. Gender identity is a person's deeply felt, inherent sense of being a girl, woman, or female; a boy, a man, or male; a blend of male or female; or an alternative gender. Everyone has a gender identity.

9.       Most people have a gender identity consistent with the sex that they were assigned at birth. Transgender persons have a gender identity that is not fully aligned with their assigned gender. Attempting to conform an individual's gender identity to their assigned sex by trying to change an individual's gender identity is not only futile and unethical, but also may exacerbate the distress associated with the incongruity between a transgender individual's assigned gender and the gender they know themselves to be.

10.      Indeed, while not all transgender or gender nonconforming persons experience clinically significant psychological distress as a result of the conflict between gender identity and assigned sex at birth, for others this distress can be extreme.

11.      The medical diagnosis of gender dysphoria refers to the condition characterized by clinically significant "distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender." Gender dysphoria is not a mild discomfort with one's assigned sex. Rather, it is a profound disturbance that, if left untreated or inadequately treated, can lead to severe mental anguish and the inability to function normally at school, at work, or in a relationship. The Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (the "DSM-5") classifies gender dysphoria as a serious medical condition.

12.      The DSM-5 lists six criteria which, when present in some combination, trigger a diagnosis of gender dysphoria. These are (i) a marked incongruence between one's gender identity and one's sex characteristics; (ii) a strong desire to be rid of one's sex characteristics because of that incongruence; (iii) a strong desire for the sex characteristics of the other gender; (iv) a strong desire to be of another gender; (v) a strong desire to be treated as another gender; and (vi) a strong conviction that one's feelings and reactions are typical of another gender. An

individual must experience two or more of these criteria for at least six months to be diagnosed with gender dysphoria.

13.     As described in further detail below, plaintiff's gender dysphoria has not been properly treated while in IDOC.

14.     If not properly treated, gender dysphoria often causes anxiety, depression, self-harm, and suicide. Indeed, plaintiff has experienced all of these things.

15.     Suicide attempt rates are particularly alarming among people with gender dysphoria: over forty percent of transgender individuals report having attempted suicide, as compared with between 1.6 and 4.6 percent of the general population. High levels of stigmatization, discrimination, and victimization cause and exacerbate these dangers.

16.     The World Professional Association for Transgender Health ("WPATH") is a multidisciplinary professional association dedicated to understanding and treating gender dysphoria.

17.     WPATH is recognized internationally as the leading professional organization devoted to the understanding and treatment of gender dysphoria.

18.     WPATH publishes and regularly updates the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (the "WPATH Standards of Care"), based upon the best available science and expert professional consensus. The seventh and current version of the WPATH Standards of Care was released in September 2011. The Standards of Care is widely recognized in the medical and mental health community as the authoritative standard for the provision of transgender healthcare.

19.     In particular, the WPATH Standards of Care have established medical treatment standards for persons living with gender dysphoria that are recognized and accepted within the

medical and mental health community, and that reflect "the consensus expert opinion among professionals in this field on the basis of their collective clinical experience as well as a large body of outcome research."

20.     Dr. Shane Reister, a high-ranking mental health official within IDOC has recognized WPATH as setting forth appropriate standards of care for prisoners with gender dysphoria.

21.     Courts also have acknowledged that the WPATH Standards of Care provide widely accepted protocols for treating individuals with gender dysphoria. *See e.g., Keohane v. Jones*, 328 F. Supp. 3d 1288 (N.D. Fla. 2018); *Edmo v. Idaho Department of Correction*, No. 1:17-cv-00151-BLW, 2018 U.S. Dist. LEXIS 211391 (D. Idaho Dec. 13, 2018).

22.     The WPATH Standards of Care explicitly state that they apply in institutional environments such as prisons: "The [Standards of Care] in their entirety apply to all transsexual, transgender, and gender nonconforming people, irrespective of their housing situation. People should not be discriminated against in their access to appropriate health care based on where they live, including institutional environments such as prisons …. Health care for transsexual, transgender, and gender nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community."

23.     The WPATH Standards of Care emphasize that "[a]ll elements of assessment and treatment … can be provided to people living in institutions," and that "[a]ccess to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements."

24.     Additionally, the National Commission on Correctional Healthcare recommends that medical care for prisoners with gender dysphoria "should follow accepted standards developed by professionals with expertise in transgender health," citing the WPATH Standards of Care.

25.     There are a variety of therapeutic treatments for individuals with a medical need for gender dysphoria treatment. The WPATH Standards of Care list the following principal types of treatment: changes in gender expression and role; hormone therapy to feminize or masculinize the body; Surgery to change primary and/or secondary sex characteristics; psychotherapy (individual, couple, family, or group) for purposes such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; enhancing social and peer support; and improving body image.

26.     When gender dysphoria is effectively treated through the therapies described above, the symptoms can be effectively addressed and the condition can be cured. Absent that treatment, persons with gender dysphoria will experience anxiety, depression, substance-related disorders, and/or the inability to function effectively at school, at work, or in a relationship.

27.     In the most serious cases, untreated gender dysphoria leads to self-harm, and suicide.

### Plaintiff's Experience as a Transgender Woman in IDOC Men's Prisons

28.     In 2009, plaintiff informed prison officials at intake that she is a transgender woman. Nevertheless, IDOC officials have continually housed her in men's prisons.

29.     IDOC doctors first diagnosed plaintiff with "gender identity disorder" in 2011. Since that time, multiple health professionals reconfirmed her diagnosis of gender dysphoria.[1]

30.     Since the beginning of plaintiff's incarceration, plaintiff has consistently sought adequate treatment from IDOC for her gender dysphoria.

31.     Although IDOC approved plaintiff to receive hormone therapy in 2012 (and only after a long battle by plaintiff), IDOC has failed to adequately monitor her hormone levels and otherwise refused to provide adequate medical treatment for her gender dysphoria.[2]

32.     Plaintiff has an extensive trauma history, including physical and sexual abuse, dating back to childhood. Plaintiff's trauma history has been consistently observed by mental health professionals, and multiple mental health professionals have diagnosed her with PTSD.

33.     Plaintiff has experienced extreme distress and physical harm relating to her gender dysphoria during her incarceration. This experience of distress and physical harm is further complicated by her PTSD.

---

[1] Plaintiff's earlier medical records reflect a diagnosis of "gender identity disorder" as opposed to "gender dysphoria." "Gender identity disorder" is a term from the Diagnostic Statistical Manual of Mental Disorders, 4th Edition ("DSM-IV"), which was published in 2000. The DSM-V, published in 2013, does not recognize gender identity disorder, but rather gender dysphoria. This change reflects a growing understanding and census among medical and mental health professionals that gender dysphoria itself is not a mental illness. However, some people, like plaintiff, experience gender dysphoria at such a level that the distress meets criteria for a formal diagnosis that might be classified as a mental disorder.

[2] Plaintiff is currently pursuing legal claims for injunctive relief against IDOC for the inadequate medical treatment, *see Monroe et al v. Rauner et al*, 3:18-cv-00156-NJR-MAB (S.D. Ill.), and she is not pursuing claims for medical treatment in this case. However, the inadequacy of her medical treatment is relevant to the claims in this case, as plaintiff's inadequately treated gender dysphoria contributes to the risk of harm she faces in a men's prison.

34.     Plaintiff has made several grave attempts at self-castration, in one instance removing the sutures from the wounds and refusing antibiotics with the hope that her genitalia would need to be amputated as a result of infection.

35.     Plaintiff has attempted suicide numerous times as well, often prompted by IDOC's failure to protect her physical safety and to treat her gender dysphoria.

36.     As a transgender woman living in a men's prison, plaintiff has also been subject to ongoing sexual assault and harassment from both other prisoners and from IDOC staff.

37.     Plaintiff has been sexually assaulted at every men's prison in which she has been housed.

> (a)  In 2014 a prisoner at Pontiac Correctional Center threatened to harm members of her family if she didn't perform sexual acts with him.
>
> (b)  In late 2016, a corrections officer at Dixon Correctional Center coerced her into giving him oral sex and groped her several times.[3]
>
> (c)  In mid-2018, a prisoner at Stateville Correctional Center forced plaintiff to do sexual acts with him under a threat of physical harm.
>
> (d)  In late 2018 to early 2019, a prisoner at Pontiac Correctional Center threatened to beat and violently rape plaintiff if she did not have sex with him.
>
> (e)  At every men's prison in which plaintiff has been housed, male prisoners have constantly subjected plaintiff to unwanted sexual touching, including grabbing her buttocks and breasts.

---

[3] Plaintiff currently has a suit for damages pending in the Northern District of Illinois concerning this incident. *Monroe v. Varga*, No. 17 cv 50218 (N.D. Ill.).

(f)  At every men's prison in which plaintiff has been housed, correctional

staff have at times inappropriately rubbed plaintiff's breasts, buttocks, and

genitals during pat-downs, in ways that are distinct from how they conduct pat-

downs on cisgender male prisoners.

38.    In addition, plaintiff has subject to pervasive sexual harassment in every men's

prison where she has been housed.

(a)  Corrections staff and other prisoners subject her to a barrage of hateful

gender-based insults on a regular basis. Among the most common insults directed

at her are "it," "fag," "he/she," "abomination," and "dick-sucker."

(b)  Likewise, corrections staff and other prisoners are constantly making

sexual comments and gestures toward her. A few recent examples:

   i.  Plaintiff recently asked an officer for her ice cup, the officer

        responded, "If you suck my dick you can get your cup," or words to

        that effect.

   ii.  Another prisoner recently came up to plaintiff in the gym and placed

        his genitals on her arm.

   iii.  Another prisoner masturbated in front of plaintiff and said, "I want to

        fuck you in the ass," or words to that effect.

(c)  When plaintiff reported the 2016 sexual assault by a corrections officer to

Dixon officials, she was subjected to a number of retaliatory acts by prison

officials. For example, prison officials moved her to a housing unit that was more

hostile to transgender prisoners, placed a "PREA" sign over her cell door, wrote

her multiple false disciplinary tickets and placed her in segregation.

(d)  Plaintiff also experiences constant, misgendering by corrections staff and other prisoners. Plaintiff typically informs correctional staff that she goes by female gender pronouns, yet they still intentionally refer to plaintiff as he/him or with the title "Mister."

(e)  Even plaintiff's own mental health and medical treaters use male pronouns in their treatment records, going completely against acceptable professional standards.

39.     The constant harassment and assault that plaintiff is subjected to in IDOC men's prison causes extreme psychological harm.

40.     Further compounding the problem, plaintiff has been provided with no mental health therapy to treat her PTSD or to help her cope with the severe distress she experiences in connection with her gender dysphoria.

41.     IDOC's failure to treat these serious medical conditions expose plaintiff to a severe risk of self-harm.

42.     Plaintiff has not felt safe in any IDOC men's prison.

43.     Plaintiff believes she will not be safe in any IDOC men's prison.

44.     Even though plaintiff is only 29 years old, she wonders how long she will stay alive in prison, and she thinks often of ending her life.

**Plaintiff's Request for Transfer to a Woman's Prison Reveals IDOC's**
**Official Policy is to House Transgender Women Based Solely on Gender Assigned At Birth**

45.     In May 2017, plaintiff filed a grievance requesting a transfer to a women's prison.

46.     In response to plaintiff's request, IDOC officials responded, "Unless gender reassignment surgery has been completed, an offender will remain at a male facility." They

further stated, "There is no policy in place to provide gender reassignment surgery while incarcerated."

47.     Plaintiff appealed this decision, and it was affirmed at every step of review, up to and including by Defendant Baldwin.

48.     Defendant's official policy is to house prisoners solely on the basis of their sex assigned at birth.[4]

49.     IDOC officials acted pursuant to this official policy in response to plaintiff's request for a transfer to a woman's prison.

50.     IDOC follows this policy not for any legitimate penological purpose, but rather for the purpose of avoiding potentially unfavorable publicity.

51.     The application of this policy to plaintiff violates her right to be free from cruel and unusual punishment as well has her right to equal protection.

<b>Defendant Knows That IDOC's Policy<br>Exposes Plaintiff to a Substantial Risk of Harm</b>

52.     Professional prison administrators like Defendant Baldwin know that prisoners like plaintiff face a serious risk of harm in men's prisons.

53.     The Prison Rape Elimination Act of 2003 (PREA) is a federal law that prohibits and seeks to eliminate sexual abuse and sexual harassment in prisons.

---

[4] Although there has been one recent instance of a transgender woman prisoner being transferred to a woman's prison in IDOC, that occurred only after extensive litigation and entry of a preliminary injunction against IDOC. *See Hampton v. Baldwin, et al*, No. 3:18-cv-550-NJR-RJD (S.D. Ill. Nov. 7, 2018). In that case the Court directed IDOC to undertake the kind of individualized housing evaluation called for under the PREA regulations. Once IDOC undertook this evaluation, it made the obviously appropriate decision to transfer the prisoner to a women's facility. *See* Angie Leventis Lourgous, *I'm Safe Here: Transgender Woman Describes Life at Illinois Woman's Prison*, CHICAGO TRIBUNE, Jan 29, 2019.

54.     Because Illinois prisons receive federal funds, IDOC is required under PREA to comply with regulations set forth at 28 CFR § 115.14 et seq.

55.     Under these regulations, IDOC officials are required to make an individualized determination of appropriate housing when it comes to housing assignments for transgender prisoners. The regulation states: In deciding whether to assign a transgender or intersex inmate to a facility for male or female inmates, and in making other housing and programming assignments, the agency shall consider on a case-by-case basis whether a placement would ensure the inmate's health and safety and whether the placement would present management or security problems. 28 C.F.R. § 115.42(c).

56.     PREA regulations also require IDOC officials to give serious consideration to a prisoners own subjective views of his or her own safety into account. *See* Section 115.42(d) ("A transgender or intersex inmate's own views with respect to his or her own safety shall be given serious consideration.").

57.     As professional prison administrators like Defendant Baldwin know, these regulations exist to protect the health and safety of transgender prisoners.

58.     As the National PREA Resource Center[5] puts it: "Being transgender is a known risk factor for being sexually victimized in confinement settings." *See* National PREA Resource Center, at https://www.prearesourcecenter.org/node/3927; *see also id.* ("Q: Does a policy that houses transgender or intersex inmates based exclusively on external genitalia violate Standard 115.42(c) & (e)? A: Yes." (March 24, 2016)).

---

[5] The National PREA Resource Center (PRC) is a project of the U.S. Department of Justice Bureau of Justice Assistance. The PRC's aim is to provide assistance to those responsible for state and local adult prisons and jails, juvenile facilities, community corrections, lockups, tribal organizations, and inmates and their families in their efforts to eliminate sexual abuse in confinement. *See* National PREA Resource Center, at https://www.prearesourcecenter.org/about.

59.     Additionally, the U.S. Department of Justice's Bureau of Justice Statistics reported in 2014 that almost 40% of transgender prisoners reported sexual victimization in state and federal prisons—a rate that is ten times higher than for prisoners in general. U.S. Dep't of Justice, Bureau of Justice Statistics, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12*, *Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates*, Dec. 2014, at https//www.bjs.gov/content/pub/pdf/svpjri1112_st.pdf.

60.     Professional prison administrators know that transgender prisoners like plaintiff are at risk of harm in men's prisons and that it is necessary to follow the PREA regulations in order to ensure the health and safety of transgender prisoners.

61.     IDOC purports to comply with PREA regulations, but it has clearly not done so with respect to plaintiff.

62.     IDOC's policy not only runs counter to PREA regulations, but it is also counter to generally professional accepted standards in the medical and mental health fields.

63.     The American Medical Association (AMA) has made a policy statement supporting prison housing policies that allow transgender prisoners to be placed in correctional facilities that are reflective of their affirmed gender status.

64.     As AMA Immediate Past Chair Patrice A. Harris, M.D. put it, "The problem facing the safety and health of transgender prisoners is severe and well-documented. . . . Transgender prisoners are disproportionately the victims of sexual assault, suffering higher rates of sexual assault than general population inmates." *See* American Medical Association, *AMA Urges Appropriate Placement of Transgender Prisoners* (June 11, 2018), at https://www.ama-assn.org/press-center/press-releases/ama-urges-appropriate-placement-transgender-prisoners.

65.     Further, the WPATH Standards of Care, referenced above, indicate that: "Housing and shower/bathroom facilities for transsexual, transgender, and gender nonconforming people living in institutions should take into account their gender identity and role, physical status, dignity, and personal safety. Placement in a single-sex housing unit, ward, or pod on the sole basis of the appearance of the external genitalia may not be appropriate and may place the individual at risk for victimization. Institutions where transsexual, transgender, and gender nonconforming people reside and receive health care should monitor for a tolerant and positive climate to ensure that residents are not under attack by staff or other residents."

### Risks to Plaintiff's Mental Health at Pontiac

66.     Plaintiff began her current placement at Pontiac Correctional Center in December 2018.

67.     Pontiac is a maximum security men's prison with harsh and violent living conditions.

68.     Plaintiff was previously housed at Pontiac from approximately 2010 to 2016.

69.     During plaintiff's previous period of incarceration at Pontiac, her mental health suffered immensely.

70.     She attempted suicide a number of times and engaged in multiple self-mutilation activities. In addition to auto-castration, plaintiff engaged in self-injurious activities, including biting the flesh in her arms until she bled, expressing a willingness to bleed to death.

71.     By 2016, plaintiff reported hearing voices and seeing images of people who had sexually abused her in the past. Mental health treaters also noted that plaintiff's self-injurious behaviors were escalating. An IDOC psychologist attributed these events to the fact that the harsh environment at Pontiac was likely triggering PTSD responses.

14

72.     Plaintiff was transferred out of Pontiac and to Dixon Correctional Center in May of 2016. As noted above, however, plaintiff was sexually assaulted by a corrections officer at Dixon within a few months of her transfer.

73.     IDOC sent plaintiff back to Pontiac in December 2018, for reasons unknown.

74.     Now that plaintiff is back at Pontiac, she faces a significant risk that her mental health will again decline.

75.     As noted above, she has already been sexually assaulted and subjected to pervasive sexual harassment.

76.     Even worse, IDOC has stopped providing plaintiff with one of her hormone therapy medications, without explanation.

77.     In addition, the mental health treatment program is among one of the worst in the entire IDOC system. A court appointed monitor in *Rasho v. Baldwin*, No. 07-cv-1298-MMM (C.D. Ill.) reports that mental health staffing levels are dangerously low. The monitor also notes a high level of use of force incidents by staff toward prisoners with mental illness at Pontiac.

78.     Plaintiff has not been provided with therapy for her PTSD or gender dysphoria at Pontiac.

79.     There is reason to think that plaintiff's mental health at Pontiac will again deteriorate and subject her to a serious risk of physical harm, just as it did in 2016.

**Plaintiff Should Be Housed In A Women's Prison**

80.     IDOC officials recognize that prisoners who are women have different needs than prisoners who are men. In particular, women are more likely than men to have experienced sexual abuse or other forms of victimization in the past. Likewise, women typically come to prison with significant trauma histories.

15

81.     In 2018, Illinois enacted a law that formally creates a "Women's Division" within the Illinois Department of Corrections (IDOC). *See* 730 ILCS 5/3-2-5.5.

82.     The law requires IDOC to develop and implement "gender responsive and trauma informed" practices at prisons within the Women's Division. IDOC officials have been implementing these practices at Illinois women's prisons through innovative training programs.

83.     For example, staff at IDOC women's prisons are trained to:

     (a)   "Keep in mind that gender does make a difference."

     (b)   "Create an environment based on safety, respect, and dignity."

     (c)   "Support practices and programs that promote healthy connections to children, family, and the community."

     (d)   "Refer issues of substance abuse, trauma and mental health issues to relevant services and appropriate supervision."

     (e)   "Encourage female offenders to improve themselves through educational and vocational programs." *See* Illinois Department of Corrections, *Supervising the Female Offender* (undated).

84.     Staff is also specifically trained to address female prisoners respectfully at all times, and to use respectful titles, such as "Ms" when addressing individual prisoners.

85.     Staff also receives specialized training on how to best interact with people like plaintiff who have trauma histories (also called "trauma informed practices").

86.     IDOC requires "trauma informed practices" in women's prisons because evidence shows that those practices lead to better outcomes for women prisoners. It leads to less conflict among prisoners and reduces the need for punishment.

87.     As the Warden of Logan Correctional Center recently described to the *Chicago Tribune*, "[T]he culture at Logan has undergone an immense culture shift recently, with staff undergoing innovative training on strategies for working with female inmates, recognizing trauma, de-escalating conflict and working with those who are mentally ill."

88.     The Warden of Logan Correctional Center acknowledges that transgender women can be appropriately housed at Logan.

89.     The mental health program at Logan is equipped to deal with prisoners suffering from trauma disorders and gender dysphoria.

90.     Plaintiff would benefit from being housed at Logan Correctional Center.

91.     Assignment to a women's prison would not only affirm plaintiff's gender identity, but it would put her in an atmosphere where she would be protected from ongoing assault and harassment and it would give her access to mental health services she needs to stay safe.

92.     There is no legitimate penological purpose for IDOC to refuse to house plaintiff at a women's prison.

93.     At the same time, plaintiff does not present a risk to other women at Logan Correctional Center.

94.     Plaintiff is not sexually attracted to women.

95.     Although plaintiff has been convicted of violent crimes, the same is true for a significant number of cisgender women currently housed at Logan. Furthermore, plaintiff's violent crimes were committed as a result of her mental illness and against men who threatened harm to her, which is true of many women at Logan.

96.     There is no legitimate penological purpose for denying plaintiff the benefits afforded to cisgender women.

**COUNT I – VIOLATION OF THE EQUAL PROTECTION CLAUSE**
**(Fourteenth Amendment Claim for Declaratory and Injunctive Relief under**
**42 U.S.C § 1983)**

97.    All paragraphs of this complaint are incorporated in this count as if set forth fully

herein.

98.    In the manner described more fully above, by refusing to place plaintiff in a

women's prison, IDOC is discriminating against plaintiff on the basis of her gender identity in

violation of the Equal Protection Clause of the Fourteenth Amendment.

99.    Plaintiff seeks injunctive and declaratory relief against defendant in his official

capacity to prevent the continued violation of her constitutional rights.

**COUNT II – VIOLATION OF THE EQUAL PROTECTION CLAUSE**
**(Fourteenth Amendment Claim for Declaratory and Injunctive Relief under**
**42 U.S.C. § 1983)**

100.    All paragraphs of this complaint are incorporated in this count as if set forth fully

herein.

101.    In the manner described more fully above, IDOC has continually subjected to

verbal sexual harassment due to her gender identity that male prisoners do not endure. The verbal

harassment is so pervasive and ongoing that it constitutes intentional discrimination on the basis

of her gender identity.

102.    Plaintiff seeks injunctive and declaratory relief against defendant in his official

capacity to prevent the continued violation of her constitutional rights.

**COUNT III – FAILURE TO PROTECT**
**(Eighth Amendment Claim for Declaratory and Injunctive Relief**
**under 42 U.S.C. § 1983)**

103.    All paragraphs of this complaint are incorporated in this count as if set forth fully

herein.

104.    Under settled United States Supreme Court authority, and in accordance with the Eighth Amendment, plaintiff is entitled to be free from a known and substantial risk of serious harm while in the custody of the State.

105.    In the manner described more fully above, IDOC has been and continues to be deliberately indifferent to the known and substantial risk of serious harm plaintiff faces from both prison staff and other prisoners as a transgender women in a men's prison.

106.    Plaintiff seeks injunctive and declaratory relief against defendant in his official capacity to prevent the continued violation of her constitutional rights.

### COUNT IV – UNLAWFUL POLICY AND PRACTICE
#### (*Monell* Claim for Declaratory and Injunctive Relief under 42 U.S.C. § 1983)

107.    All paragraphs of this complaint are incorporated in this count as if set forth fully herein.

108.    The harm plaintiff has suffered and continues to suffer was caused by unconstitutional policies, practices and customs of the Illinois Department of Corrections, described above and below, which were ratified by policymakers for the Illinois Department of Corrections with final policymaking authority.

109.    At all times material to this complaint, the Illinois Department of Corrections has interrelated *de facto* policies, practices, and customs related to transgender prisoners which included, inter alia:

> (a) Improperly housing transgender women prisoners in male prisons instead of the female prisons;

> (b) failing to properly train IDOC employees on how to care for and interact with transgender prisoners;

> (c) condoning a culture of harassment and abuse of transgender prisoners in

IDOC prisons;

(d) failing to adequately investigate complaints by transgender prisoners

related to allegations concerning PREA and other wrongdoing on the part

of correctional officers.

110.     IDOC's policy is to house prisoners solely on the basis of their sex assigned at birth rather than making an individualized assessment as the PREA regulations require. All transgender prisoners except one (as explained in footnote 4 above) are currently housed in male prisons where they are at risk of being subjected to sexual and physical abuse.

111.     The interrelated policies, practices, and customs alleged above were well known within the IDOC. During the relevant time period, Defendant Director Baldwin had notice of these widespread practices by employees at the IDOC.

112.     The widespread practices were allowed to flourish—and become so well settled as to constitute de facto policy of the IDOC—because governmental policymakers and authority over the same, namely, Defendant Baldwin, exhibited deliberate indifference to the problem, thereby effectively ratifying it.

113.     Plaintiff seeks injunctive and declaratory relief against defendant in his official capacity to prevent the continued violation of her constitutional rights.

## REQUEST FOR RELIEF

WHEREFORE, plaintiff requests that this Court enter judgment in her favor against the defendants in the following manner:

1.     Adjudge and declare that the policies, practices, and conduct described in this Complaint are in violation of the rights of plaintiff under the Fourteenth and Eighth Amendments to the United States Constitution.

2.      Enjoin defendant from subjecting plaintiff to the unlawful policies, practices, and conduct described in this Complaint.

3.      Order that plaintiff be transferred out of Pontiac Correctional Center to a women's prison.

4.      Order that plaintiff receive adequate mental health services to treat her serious mental health needs.

5.      Order further injunctive relief necessary to address the ongoing violations suffered by plaintiff.

6.      Retain jurisdiction of this case until such time as the defendants have fully complied with all orders of the Court, and there is reasonable assurance that the defendants will continue to comply in the future with these orders.

7.      Award plaintiff reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988.

8.      Award plaintiff such other and further relief as this Court may deem appropriate and just.

Respectfully submitted,

**JANIAH MONROE**

By: /s/ Alan Mills
   One of her attorneys

Alan Mills
Elizabeth Mazur
Nicole Schult
Uptown People's Law Center
4413 N. Sheridan
Chicago, IL 60640
(773) 769-1411

Sheila A. Bedi
Vanessa del Valle
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 E. Chicago Avenue
Chicago, IL 60611
(312) 503-1271